May it please the Court, my name is Karen Handorf, I represent the Plaintiff and I'd like to reserve three minutes for rebuttal. The issue on appeal is whether the District Court erred in dismissing the complaint alleging that Wells Fargo defendants violated their actions, otherwise known as TDFs, as plan investment options when less expensive, more highly rated, and better performing options were readily available. So it's not the initial designation, but it's the keeping that's at issue. That is correct. The initial choice was outside of the statute of limitations period, but as the Supreme Court stated in ongoing duty to monitor the investment options in the plan, and therefore the complaint. All of the actions by the plan fiduciaries in terms of monitoring, even after the initial selection, are subject to ERISA's duties of prudent loyalty. And so that is what we're talking about here. Are the expense ratios and the historical performance publicly available? The expense ratios you could probably, if you were looking carefully, of course, we have the expense ratios in the complaint. So, you know, participants, you have to consider that in this particular case, most participants are not sophisticated. They rely upon the plan fiduciaries to pick the investment options. And so, you know, if they were to look at, they're limited to what the plan options are in the plan. So even though perhaps they could have searched it out and found out what the expense ratio was, it wouldn't have been readily available, and they wouldn't have had any other option. They would have had to stay in this particular, these were the only options available to them. So this case really presents not the normal typical fee case because it's, in a sense, the case is unique and the circumstances are a bit egregious because here you have a financial institution, Wells Fargo, and their fiduciaries that had conflicts. And they acted on those conflicts to benefit Wells Fargo at the expense of plan participants. Every single dollar contributed to or defaulted into the Wells Fargo's assets under management and the fees it collected. But every dollar paid in excess fees resulted in a dollar less in plan participants' retirement accounts. So it had a direct impact on the retirement accounts of plan participants. And certainly ERISA allows fiduciaries with the loyalties to both the employer and the plan to serve as fiduciaries. But this court and other courts have demanded that such conflicted fiduciaries make an even more careful and impartial investigation to ensure that their decisions are not tainted by conflict. Here, a prudent and loyal fiduciary who was not conflicted would not have chosen the more expensive option, especially when that option was not justified by performance or any other thing. In this court, the district court here did not get any weight to this conflict of interest and in fact ignored the guidance established by this court in Braden v. Wal-Mart in 2009. In Braden, which is also a fee case but involving not a proprietary fund but just the choice by fiduciaries of fees of investment options for the plan, this court stated that you must take into account the participant's limited access to information, which is often solely in the defendant's possession. Participants do not have access to the meetings of the fiduciaries. They don't have access to the minutes of the meetings of the fiduciaries. And thus in Braden, this court stated that the complaint is sufficient to withstand a And the Braden court reiterated that the complaint's factual allegations must be taken as true and the inference is drawn in favor of the plaintiff. And more very important, the complaint should be read as a whole. It should not be parsed piece by piece to determine whether each allegation in isolation is plausible. Counsel, what inferences, if any, were drawn in favor of the defendants by the district court? Well, the court drew the inference that the comparable funds were not, in fact, comparable. The court determined that there were other reasons why the fiduciaries might have chosen these particular funds. The court, to the extent that there were any facts in the record, the court concluded that those facts were not plausible. Even though it's, the complaint is quite clear and simple. Basically says the plan paid two and a half times more for the funds than comparable funds. Those comparable funds were based on indexes. They were passably managed. If you look at those funds, the funds that the TDFs at Wells Fargo had, they didn't perform as well as the other comparable funds. And the rating agencies, Lipper and others, where they rated the Wells Fargo funds either neutral or negative, they rated the comparable funds very highly. So you're based with a complaint that basically says these are more expensive funds. They don't perform as well. They're not rated as well. So why would you put the plan's money in them if you were, and you weren't acting under any conflict of interest? But the added facts in the complaint are that, you know, the plan assets from the Wells Fargo plan made up 28% of the assets of the TDFs. And then when you add that to other plans managed by Wells Fargo, it ends up being 58% of the assets of the TDFs were either Wells Fargo or plan assets managed by Wells Fargo. So that's like almost 58%. Not many other people were putting money into these TDFs. And so this court continually has said, back in Martin v. Filen in the early 90s, and Tussey v. ABB, that when you've got a conflict of interest, you have to look very carefully at what the fiduciaries are doing. Because they're acting under, they're not in the public domain. And it's, they're inherently drawn to favor the interest of the employer. They almost have to go outside of that, the normal course of fiduciary decision making, to make certain that they aren't drawn to the, to the, to the conflict of interest. And this court really didn't look at the conflict of interest at all. Well, what case says that a fiduciary, even though that's their own fund, has to, on a yearly basis, go through and eliminate their, their fund when their expenses may be higher, and the performance may be worse? Is there a case that does that? Well, the Supreme Court in Tibble v. Edison was dealing with an ERISA plan that had, that the claim was that the plan was paying too much for the funds that were investment options in the plan. The lower court said that the statute of limitations was blown because they had not alleged that the initial selection was wrong. And the Supreme Court said that you look at trust law to determine what the duties of fiduciaries are. And under trust law, you have an underlying, under an ongoing duty to continue to look at the investment options to see whether they continue to be prudent and loyal options. And so that if fiduciaries on a regular basis are looking, these fiduciaries would have been looking at the expense ratios and the performance of the funds, they would have reached the conclusion that they were making their participants pay much more than they would if it were in another fund. They weren't making, they were giving an option, right? Well, these were the only options in the plan. And this was the participants' money. The participants' money out of their paycheck to put into the plan to save her retirement. The particular fund that you're alleging here is just one of many options, right? There were other options, but the TDFs are really very compelling options for plan participants because they're designed to target when you're going to retire. And so you kind of don't have to think about it anymore. They, they're diversified within themselves. Are there other TDF type options available? Not in this particular plan, no. And the other thing that's true here, which was not true in Braden, not true in a lot of the other fee cases, is these participants were defaulted into these TDFs. By that, I mean that some people, you're automatically enrolled when you became, become an employee. And if you don't pick a particular fund that you want to invest it in, you're defaulted into a target date fund that's under the statute. There's nothing wrong with putting your money in a But you have to realize that these people are not people that are thinking about what their investment options are. They're defaulting. So you have to be even more careful about what those default options are. So, so basically what you have here are people who are relying upon plan fiduciaries who have this plan partly because it's compensation for the employees, partly because they get tax benefits for having it. They're relying upon these fiduciaries to pick options that are going to be good for them. Let me ask you this. Um, let's say for one year, this particular fund happens to have a higher expense ratio and a poorer performance. Do they have to eliminate it at that point? No, I would not say that they would have to, they might have rational reasons to keep it. For example, they have different investments, right? Yes. But I would say markets behave differently every year. That's exactly right. Times they get better and sometimes they get worse depending on the particular investment mix that you have, right? That's correct. So two years, is that the point at which they have to? Well, I think it depends on a host of, you know, fiduciaries are under a strict standard and, and they have to consider all of the circumstances. It could be that after a year of, they say it's not worth it and it's easy enough to switch to something else that it makes sense. They could say, well, the economy's odd this year, we're going to wait. Um, but the complaint alleges that over a long period of time, these funds were more expensive. And one of the reasons they were more expensive is because unlike other funds, there were two layers of fees. You had fees for managing the TDFs and fees for managing the underlying funds. And that is not true in most other cases. So that was an added reason why they were more expensive. That doesn't really take a lot of analysis of the facts and circumstances of the economy. It's just what it is. Um, and so for those reasons, uh, we think that the district court simply did not look at the complaint the way that this court has told courts to look at complaints alleging breaches of fiduciary duty when the participants have very little information about how the process actually went about. Well, thank you. May it please the court. My name is Russell Hirschhorn on behalf of the defendant's appellees. Ms. Handorf and myself agree on one thing, and that is that this case is unique. We do, however, we agree for different reasons. I'd like to address three points today, your honors. First, that the district court applied the proper pleading standard established by Braden, Twombly and Iqbal. Second, that the district court correctly concluded that there are no allegations in the complaint itself that establish a plausible fiduciary breach claim. And third, I'd like to address the fact of Braden itself and the facts that are alleged in Braden and that this court found were sufficient to survive a motion to dismiss and that are not at all present here. In fact, this case is nothing like Braden and further Braden, I respectfully submit requires affirmance of the district court's opinion. Turning to my first point, there really is no dispute in this appeal about the governing pleading standard. In Braden, this court applied the teachings of Twombly and Iqbal to a fiduciary breach claim, and three particular points are relevant, all of which begin on page 594 of the decision. First, evaluation of a complaint upon a motion to dismiss it is a context, quote, context-specific task that requires the reviewing court to draw on its judicial experience and common sense. Second, a plaintiff must show at the pleading stage that success on the merits is more than a sheer possibility, not a probability, doesn't require a probability, but it's got to be more than a possibility. And third, quote, an inference pressed by the plaintiff is not plausible, is not plausible if the facts he points to are precisely the result one would expect from lawful conduct in which the defendant is known to have engaged. And after this court decided Braden, the Supreme Court left no doubt about the importance of the motion to dismiss. Let me ask you this. Why isn't it enough to plead that there is a long history of this particular fund, which is your own fund, having higher, significantly higher expenses and significantly worse performance, and then I think you throw into that that participants are defaulted into that particular fund. Why isn't that enough to raise a reasonable suspicion that there's self-dealing going on here? Your Honor, there is absolutely nothing in the complaint that alleges the Vanguard or Fidelity fund, Vanguard with respect to performance and Vanguard and Fidelity with respect to fees, that they are appropriate comparators. The district court did not conclude that the funds were inappropriate comparators. The district court concluded here that there is nothing in the complaint itself, very different question, very different ruling, nothing in the complaint itself that alleges those two funds are appropriate comparators. In fact, when we look at the performance, as your Honor mentioned, the Vanguard performance that's identified in the complaint is a so-called weighted average that is nowhere defined in the complaint. It's nowhere defined in the district court briefing. It's nowhere defined in the appellate court briefing. And in fact, a careful review of paragraph 31 of the complaint where the on a one-year based trailing basis and on a five-year trailing basis in certain circumstances, the Wells Fargo target date funds, in fact, outperformed or outyielded whatever undefined metric the plaintiffs have used in this case. So it's not fair to say by any measure that there's an allegation of underperformance that gives rise to an inference of poor decision-making by the fiduciaries. So had they alleged that these other funds were comparable, then they would have sufficient basis to survive a motion to dismiss? Your Honor, I don't know what's enough. What I do know is that this court said in Braden what was enough. And the facts in Braden were materially different. And I might as well turn to the third point I wanted to discuss, because I think the stark contrast between what was alleged in Braden and what is alleged here will make the point well. In Braden, there were allegations, number one, that the alleged comparators did not perform to the benchmark that they were designed to meet. There's no such allegation in this case. In Braden, there were allegations, extensive facts, the Eighth Circuit called it, that there were investment options that were in retail share classes, more expensive share classes than institutional share classes, which were much cheaper and achieved exactly the same rate of return. There were allegations, those allegations are not present here. There are allegations in Braden about how the planned fiduciary committee responsible for picking the investment options were complicit in a trustee got kickbacks for inclusion of certain funds within the plan. That amounts to stealing plan assets. There's not even a hint of anything like that in this case. What we have here is the lawful selection of proprietary funds that both Congress and the Department of Labor have expressly approved of, both on the ERISA statutory law and on the DOL proposed rulemaking. And there were 12B1 fees, marketing fees, essentially, that were charged to participants, but no such services were rendered to participants. None of those allegations are present here. The Eighth Circuit in Braden took the totality of those allegations and said, yeah, this gives rise to an inference of misconduct, and we'll let you survive a motion to dismiss and let's see what happens. There is nothing remotely similar to that case here, despite what plaintiff has to say in the briefing at this court. Counsel, in that regard, could you address the allegation in the complaint that there were double charges for certain fees? Yes, Your Honor. There were no double charges. They call them double charges, but they acknowledge in the complaint that the charges were one at the target date fund level for managing the allocation of equities, the underlying index, each of those indices. And as Hecker v. Deere made clear, and this court made clear in Braden, it's the total fee that matters, and we have no responsibility to go out and find the cheapest set of funds. That's not what the fiduciary responsibilities require. Was there any allegation in the complaint that the fees were unreasonable? Your Honor, the only allegation in the complaint is that the fees were two and a half times higher. There is no allegation in the complaint that the fees are excessive. There's no allegation that the fees are excessive to the market. I implore this court to exercise what the Twombly Court requires, and that is rely on its judicial experience and its common sense. And what we have here is we've got an allegation that one fund supposedly performed better, and we've got an allegation that two funds supposedly were cheaper. If that's all it takes to plead a plausible claim in this circuit, it will open the floodgates to every single financial services firm and every other company that has affiliated funds, a practice that is widely recognized, perfectly permissible under the statute, to class action discovery. Well, what more would they have to plead to get over the hurdle? They've got to plead something that gives rise to an inference of misconduct. In all the cases that the plaintiffs like to cite to that have been going on around this country, the allegations are materially different. In the target date fund cases that are out there, including the Kruger v. Merrill Price case from the District of Minnesota, the allegations in that case were that there were brand new target date funds that were added to the plan two days after the target date funds were created. I don't know whether that's enough. That particular court said it's enough there. There are allegations in complaints around the country where the challenged fund did not perform to the benchmark that it was designed to meet. Plaintiff complains that she doesn't know or he doesn't know what the benchmark is, but in paragraphs 21 and 22 of the complaint, they allege exactly what the benchmark is. It's Dow Jones Index. There's no allegation. There's not even an allegation in the complaint about how the fidelity funds performed, a fund that they identified in their complaint. How could it possibly be enough to identify one fund that did better, supposedly, because we don't even know how they measured the performance, and two funds that supposedly were cheaper to state a claim for participants were defaulted into this particular one. Sure. Given the history of higher expenses and not as good a performance, shouldn't the fiduciaries have been required to re-evaluate which one would be defaulted? Your Honor, it presupposes that they underperformed. Your Honor, you have to take allegations that have a foundation as pled, not conclusory allegations that have an undefined metric accepted as true. Target date funds, as Ms. Handorf acknowledged, are a very good investment option for those individuals who choose, for whatever reason, to sign up for the 401k plan and, for whatever reason, do not make their investment decision. Section 404c5 of ERISA sets up a framework under which plan fiduciaries are permitted to set up qualified default investment options, commonly referred to as QDIAs, in the industry. And the Senate report that's cited in our briefing acknowledges that up to 95%, 96%, 97% of those default investment options are using target date funds. As a matter of practicality, one would never, Your Honor asked about whether there were other target date fund options available. One would never offer a 2025 fund from Wells Fargo and a 2020 fund from another financial services. It's a suite of funds. So here we have a suite of Dow Jones target date funds that were available that are widely viewed to be a perfectly prudent investment option, and there are no allegations in this complaint that plausibly state a claim. But of course, you could have offered a suite of similar funds from a different provider, right? We could have, but there's no requirement to, and in fact, the Department of Labor recognized that it would be contrary to practice, right? Financial services firms have the expertise in-house. Why would they go pay fees to somebody else to have that? Why would the plan go pay fees to somebody else, particularly when they're getting a rebate for those fees from Wells Fargo? I think we've touched on most of the points, Your Honor, that I would like to, that I wanted to make. I just really, one or two other points with respect to the default option. We talked about the default option. There is this allegation of seeding, but that there is nothing in the complaint to back it up. And in fact, the indisputable record establishes that the default option was well before the allegations in this complaint came to pass. I think with that, unless Your Honors have other questions. Counsel, I did have one question. Is it your position that the complaint necessarily embraces the prospectuses of the funds at issue? And if so, where? Unquestionably, Your Honor. First of all, it's important to recognize at the district court and in this court, the plaintiff has never challenged the submission of the, of what's in the appendix. That in so far as Your Honor, Judge Grunder asked that question earlier, and Judge Grazia, you've asked that question now, that, that, that argument is waived clear as day in this circuit. Number two, even if for some reason Your Honors conclude it's not waived, those, the fund prices, the expense ratios Ms. Handorf has acknowledged are publicly available. They are in the, they have not, their authenticity has not been. As well as historical performance? Yes, Your Honor. Anybody can go on to the, with Google these days, you can go get anything. And the prospectuses are available on sec.gov and all this information, the fee expense ratios are in summary plan descriptions that are given to participants. There really is, there has been no dispute and nor could there be any plausible dispute about these documents, their availability and certainly there's been no question as to their authenticity. There are no other questions? None. Thank you. Thank you, Your Honors. Ms. Handorf, rebuttal? Yes. Thank you. I'd like to point out one thing that we need clarification on, I think, is that the Department of Labor has not approved of the use of proprietary funds. The Department of Labor, very early on in the statute, before 401k plans were even common, they didn't really come into existence very much until the 1990s, said that a plan could use their own proprietary funds. It makes sense in the any shortfalls anyway. So it is correct that the Department of Labor said that you could do that, and you could only do it, the fact is, is that all it does is get you out of the prohibited transaction provisions of ERISA, because ERISA prohibits a plan from investing in the assets of a plan sponsor. So the Department of Labor said that if you meet certain criteria, you are immune from the prohibited transaction provisions, you've met the exemption. But the Department of Labor has consistently said that even though you're allowed to do it and not violate the prohibited transaction provisions, you still must act prudently and loyally in determining whether these are the best funds for the plan. And so what we're saying here is they didn't act prudently and loyally. Now, the defendants keep pointing to the facts of this case, the facts of the determined. There's enough in this complaint to show that the assets that the plan was paying two and a half percent more than for comparable funds. The performance... Because the key is comparable, right? The key is comparable. Are these other funds also sort of the age, you know, age-appropriate funds? Yes, they are age-appropriate funds. They're based on index funds. They're passive. They're managed so there's no real reason why you would pay an extra fee to get some expertise in terms of management of the funds. Are they perfectly comparable? You're not going to find another fund that's perfectly comparable. But fiduciaries aren't looking at what is perfectly a comparable fund. There's a lot of decision-making that goes into what you're going to choose. But they are required to look at funds that basically have the same purpose, which is to provide for retirement at a target date. And that's what, in this particular case, they didn't do. At least the evidence clearly infers that. Do we have evidence as to what the plan fiduciaries, has that been alleged, what they actually considered? No, because we can't. There is no access to that information. So we would ask this court to reverse the lower court decision. Thank you, counsel. We appreciate your briefing and arguments. Interesting case. The court will decide it in due course.